IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:22-CV-345-FL

| | | |
|---|---|---|
| JEAN J. GELIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| N-ABLE TECHNOLOGIES, INC. f/k/a | ) | |
| Solarwinds, MSP, a Delaware corporation, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on defendant's motion for summary judgment (DE 48).

Also pending is plaintiff's motion to withdraw as attorney (DE 62). The motion for summary

judgment has been briefed fully, and the issues raised are ripe for ruling. For the following reasons,

the motions are granted.

## STATEMENT OF THE CASE

Plaintiff, a black Haitian American male, commenced this employment discrimination

action against his former employer in Wake County Superior Court, May 17, 2022, asserting

claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq. ("Title VII"),

for race (Count I) and national origin discrimination (Count II), and for wrongful discharge under

North Carolina law (Count III). Plaintiff seeks compensatory and punitive damages, back and

front pay, costs, fees, and interest.

After defendant removed the action to this court, the court dismissed those parts of

plaintiff's Title VII claims based upon a theory of constructive discharge as well as plaintiff's

claim under North Carolina law, upon defendant's partial motion to dismiss for failure to state a claim upon which relief can be granted.  (See April 25, 2023 Order (DE 17) at 10).

Following a period of discovery on those part of Counts I and II remaining,[1] defendant filed the instant summary judgment motion, relying upon a statement of material facts and appendix including the following:  1) excerpts of plaintiff's deposition; 2) a declaration by Rene Van Steenbergen ("Van Steenbergen"), defendant's employee and plaintiff's former supervisor; 3) plaintiff's discovery responses; 4) correspondence between plaintiff and defendant's employees; 5) plaintiff's 2020 performance review, and 6) plaintiff's W-2s and earnings summaries.

In response, plaintiff relies upon an opposing statement of facts and appendix comprising the following: 1) depositions of Van Steenbergen and Catherine Skahan ("Skahan"), defendant's Rule 30(b)(6) designee; 2) defendant's discovery responses; and 3) personnel file for Van Steenbergen, in addition to correspondence relied upon by defendant.  Defendant replied in support of its motion, relying on a response to plaintiff's statement of facts.

## STATEMENT OF FACTS

Defendant was "founded in 2000 for the purpose of helping Managed Service Providers ('MSPs') and other Information Technology ('IT') professionals implement system monitoring, security, and business solutions for their small to medium size clients." (Def's Stmt. (DE 49) ¶1).[2]

---

[1]    On October 27, 2023, the court allowed plaintiff an extension of time to complete limited additional discovery, over defendant's opposition, and the court allowed defendant leave to amend an initial motion for summary judgment filed October 10, 2023, following completion of the extended discovery period.  (See Oct. 27, 2023 Order (DE 34) at 3).  The court thereafter denied plaintiff's motion to strike defendant's initial motion for summary judgment, (see Nov. 7, 2023 Order (DE 35) at 1), and the court resolved a motion for protective order by defendant and a further motion for extension of time to file dispositive motions, through conferences and hearings before a magistrate judge.  (See Dec. 4, 2023, Minute Entry (DE 46)).

[2]    Pursuant to Local Rule 56.1(a)(2), the court cites to paragraphs in the parties' statements of facts, or portions of such paragraphs, where not "specifically controverted by a correspondingly numbered paragraph in the opposing statement."

2

It "offers a framework that allows its clients to remotely manage IT infrastructures and detect problems and intrusions." (Id. ¶2). "Over the years, [defendant] expanded its offerings and its client base, and in 2013, it was acquired by SolarWinds Corporation ('SolarWinds')." (Id. ¶3). In July 2021, defendant separated from SolarWinds and registered as an independent company. (Id. ¶ 3; see Pl's Stmt. (DE 56) at 2). "Today, [defendant's] global workforce serves over 25,000 MSPs and their small and medium sized end user businesses, and [defendant] has over 1,400 employees," with a principal place of business in Massachusetts. (Def's Stmt. (DE 49) ¶5).

"Plaintiff's race is black, and he is of Haitian descent." (Id. ¶7). "Plaintiff was born in Haiti on March 19, 1960, and continued to live in the country until he was twenty years old, when he moved to the United States to begin college." (Id. ¶9). After receiving his college degree, plaintiff worked as a supervisor at an insurance company for eleven years. (Id. ¶ 11). He then received a Master of Science degree in management in 2000, and then worked as a systems and IT manager at several companies.

"In late 2018, Plaintiff was approached by [defendant] to interview for the position of a Director in [defendant's] DevOps Department," which is "a Department within the Company's DevOps Division that is responsible for bridging the gap between software development and IT operations." (Id. ¶¶ 19, 30). The DevOps Department's "focus is to streamline and automate the software development and deployment processes, ensuring a more efficient and reliable software delivery pipeline, and supporting DevOps when [defendant] releases new features and applications." (Id. ¶ 19).

"Plaintiff was interviewed by Chris Day ("Day"), Vice President of DevOps and Technology Operations, [] Van Steenbergen, Director, DevOps, and the entire DevOps Department." (Id. ¶ 20). "Van Steenbergen, as a Senior Director, provided feedback regarding

Plaintiff's interview to Day, who made the ultimate decision regarding . . . which applicant to hire for the position." (Id. ¶ 21). "Based on [p]laintiff's experience and interview, Van Steenbergen recommended that Day select [p]laintiff for the position." (Id. ¶ 24).

"From December 3, 2018 until March 2020, Plaintiff worked from [defendant's] office in Morrisville, North Carolina." (Id. ¶ 25). "Due to the COVID-19 pandemic, he worked primarily remotely from his home in Cary, North Carolina from approximately March 2020 until his resignation on June 15, 2021." (Id.). "Plaintiff's salary during his employment with [defendant] was approximately $164,000.00." (Id. ¶ 26).

"In February 2019, 2020, and 2021, [p]laintiff received the full amount of bonus for which he was eligible, equal to twenty percent of his annual salary." (Id. ¶ 27). "Plaintiff also received benefits while he was employed by N-able, including: health insurance, vision insurance, dental insurance, a 401(k) plan." (Id. ¶ 28). "These benefits remained unchanged for the duration of [p]laintiff's employment." (Id. ¶ 29).[3]

"All DevOps Directors [at defendant] report to a Vice President within the DevOps Department." (Id. ¶ 33). "A Director within the DevOps Department would typically be responsible for managing approximately twenty-five percent of the employees in the Department." (Id. ¶ 35). "From the period of December 3, 2018 through March 2021, four individuals reported directly to Plaintiff: two Managers in the DevOps Department, Derek Devernoe ('Devernoe'), and Bradley Mikel ('Bradley'); Stas Starikevich ('Starikevich'), DevOps Engineer; and Jesse Osiecki ('Osiecki') Senior Systems Engineer." (Id. ¶ 36). "From December 3, 2018, when Plaintiff's employment began, until approximately November 2020, his supervisor was Day." (Id. ¶ 37).

---

[3] Plaintiff asserts that "while the stated benefits remained unchanged, his job purpose and condition drastically changed." (Pl's Stmt. (DE 56) ¶ 29).

"From approximately July 2020 to September 2020, [p]laintiff took a medical leave of absence from N-able, during which he was treated for cancer." (Id. ¶ 38). "Plaintiff had 'no issues' obtaining approval for this leave." (Id. ¶ 39). "During [p]laintiff's medical leave, [p]laintiff believes Day made the decision to reassign a team . . . which had previously reported to [p]laintiff, to Jay DeLeon ('DeLeon'), a Project Manager who also reported to Day." (Id. ¶ 41). Plaintiff "'supported' this decision, and did not complain or question the decision to Day or any other employee" of defendant. (Id. ¶ 42). "However, Van Steenbergen states that, as [p]laintiff could not manage this team during his medical leave of absence, Day made the decision that Osiecki and the DevOps Security team that reported to Osiecki would be managed by primarily by Day and Van Steenbergen." (Id. ¶ 43).

"In November 2020, after an organizational change to the Company, Van Steenbergen was promoted to Vice President of DevOps, and became [p]laintiff's supervisor." (Id. ¶ 47). "Prior to this, [p]laintiff and Van Steenbergen had both worked for the company at the Director level as peers." (Id. ¶ 48). "Van Steenbergen lived, worked, and was a native of the Netherlands." (Id. ¶ 48). "As fellow Directors of the Company within the same reporting structure, Plaintiff and Van Steenbergen did not work closely together in their day-to-day job duties." (Id. ¶ 49). "As Directors, Van Steenbergen and [p]laintiff communicated primarily via email, and did not often speak by phone or video call." (Id. ¶ 50). "Van Steenbergen states that his primary contact with Plaintiff during this time was in larger group video meetings." (Id. ¶ 51). "Plaintiff believes Van Steenbergen was aware of Plaintiff's Haitian national origin because Plaintiff spoke with a Haitian accent, and because Plaintiff discussed his upbringing in the country." (Id. ¶ 45).

"Van Steenbergen found [p]laintiff to be professional and competent in performing his duties as a Director," and he "was aware of no issues regarding Plaintiff or his job performance."

5

(Id. ¶ 52).  "However, [p]laintiff described Van Steenbergen in their peer relationship as 'not helpful,' 'a little bit difficult to work with,' and 'hard[] to collaborate with.'" (Id. ¶ 53).  "Even so, when Van Steenbergen became [p]laintiff's supervisor, [p]laintiff described himself as 'excited,' and thought the change was 'great,' hoped to 'support' Van Steenbergen."  (Id. ¶ 54). "Van Steenbergen likewise looked forward to working more closely with [p]laintiff."  (Id. ¶ 55).

"[U]pon becoming [p]laintiff's supervisor, [Van Steenbergen] scheduled a meeting to discuss [p]laintiff's prior experience and role within the DevOps Department, as well as goals and expectations for the position."  (Id. ¶ 56). "In late 2020, [p]laintiff . . . had a conversation with Van Steenbergen . . . regarding a performance improvement plan."  (Id. ¶ 57).  "Van Steenbergen stated to him 'I know you were on an improvement plan, but with me, we will start all over.'" (Id.). Plaintiff told Van Steenbergen that "he had not been on a performance improvement plan."  (Id. ¶ 58).

"In early 2021, Van Steenbergen was directed by Day and other executives at the Company to make organizational changes in preparation for [a] July 20, 2021 Spin-Off of N-able from SolarWinds" (hereinafter the "Spin-Off").  (Id. ¶ 64).[4]  "On January 18, 2021, Van Steenbergen met with Plaintiff to discuss the possibility of his assuming [a] cybersecurity and incident response processes role, and to offer Plaintiff the position."  (Id. ¶ 73).  Plaintiff "was aware that the Spin-Off was in process."  (Id. ¶ 74).  Van Steenbergen "recalls explaining that while [p]laintiff would not have direct reports, at least for some initial period, [p]laintiff would remain a Director within the DevOps Department, would continue to report to Van Steenbergen, and that his pay, bonus opportunity, and benefits would remain unchanged."  (Id. ¶ 77).  "Van Steenbergen recalls that Plaintiff then then raised the possibility of the position having at least one direct report to help with

---

[4]     Plaintiff asserts that "N-Able's spin-off began on February 1, 2021, when it filed an Application for Amended Certificate of Authority with North Carolina's Secretary of State."  (Pl's Stmt. (DE 56) ¶ 64).

6

administrative activities in the new role." (Id. ¶ 79). "Van Steenbergen responded that he agreed that direct reports could certainly become necessary to support the role." (Id. ¶ 80).

"Van Steenbergen encouraged [p]laintiff, should he accept the role, to identify specific areas where he needed direct reports or felt that direct reports could contribute, as was required for all personnel budget requests." (Id. ¶ 82). In a January 18, 2021, email, Van Steenbergen reiterated he would like plaintiff "to focus on incident and problem management, where you and your experience should make this a solid process into our org and outside." (Def's Ex. C2 (DE 50-4) at 3). He also reiterated, "[t]his means, I'm going to move your direct reports to somebody else, probably first to [Van Steenbergen] for the interim," and that if plaintiff had any questions he should reach out to Van Steenbergen. (Id.). "Plaintiff responded less than an hour later, again expressing his acceptance of the position and enthusiasm by stating that he was 'excited to take on that[sic] new role that will position me to help drive our IT [Service Management] process to maturity.'" (Id. ¶ 89). "Plaintiff assumed the new role and job functions in approximately March 2021." (Id. ¶ 94).

In a March 1, 2021, email Van Steenbergen announced to all employees in the DevOps Department "position and organizational changes for a number of employees in light of the upcoming Spin-Off," including "six promotions" of employees to "Operations Engineer"; "Lead Operations Engineer"; "Senior Operations Engineer"; "Senior Program Manager"; "Senior Manager of DevOps"; and, one employee, Sean O'Shea ("O'Shea"), "to Director of DevOps." (Id. ¶¶ 112, 113). He also announced two additional transfers of management responsibility. (Id. ¶ 114).

"Plaintiff responded to Van Steenbergen's March 1, 2021 email within minutes, noting that he was not included in the email and asking whether Plaintiff 'should be worried' with a smiley

face emoji." (Id. ¶ 116). "Plaintiff testified that at the time, he was, in fact, 'worried' by Van Steenbergen's email, and understood from that email that he 'd[id] not matter' to Van Steenbergen in the organization, and felt that Van Steenbergen treated Plaintiff like he 'd[id] not exist.'" (Id. ¶ 117). "The following morning . . . Van Steenbergen emailed all employees in the DevOps Department stating that on the 'promotions email' the day prior, he 'forgot one topic,' by 'mistake.'" (Id. ¶ 123). "Van Steenbergen then announced that in light of the upcoming Spin-Off, [p]laintiff was "changing roles within DevOps,' in order to support the N-able business in governing and adjusting processes to achieve Global IRP." (Id. ¶ 124). "Van Steenbergen's email announced that [p]laintiff's 'new challenge' would be to work with 'IT, Support, and Engineering' to evaluate and adopt these new processes, noting [p]laintiff's experience in 'change management,' 'problem management,' and 'incident reports.'" (Id. ¶ 125). "Van Steenbergen's email also praised [p]laintiff's work for the Company: "[plaintiff] did a great job over the years in supporting GDO and SecDevOps, and did build a strong high performing team, I like to thank [plaintiff] for this achievement, great job!" (Id. ¶ 126). "Finally, the email stated that '[w]ith this move [plaintiff's] Direct reports moved to myself, where we are waiting to hire a new [DevOps] Director in the RTP Office." (Id. ¶ 127).

Plaintiff emailed Day regarding Van Steenbergen's omission, and also expressed other concerns about his treatment:

> For year 2020, I had the highest performing Team within Global DevOps, as a results, many people got promoted or moved to other functional areas like Sebastian, Anuj, Stas, Derek, etc . . . However, Rene saw it a negative. For example, he said that in 2020 GOO was Chaotic, because many people were leaving. He failed to understand that because of my leadership, mentoring and coaching, members of my team developed and became more marketable which explains the promotions/changes.
>
> Also Rene seemed to have used my sick leave against me, in my performance review, by stating that SLO and Problem Management objectives were not operationalized because I was out sick. When I went out on sick leave, I was

8

protected by FMLA, so it concerns me that it was used as a performance issue. I have also asked Rene to allow me to continue managing people (For example the Security Team) which is a concern of mine, being that this will be first time in my professional career, I don't have direct reports. He stated he will work that, but I am not sure if he is taking it seriously.

(Id. ¶ 130). "In the same email, [p]laintiff stated that 'I have had reservations talking to [Van Steenbergen] about those concerns, because I feel he is not open to constructive criticism. I understand, we are not all perfect and I just want him to not take me for granted and value me, just as he does with [DeLeon] and [O'Shea].'" (Id. ¶ 131).

"When [p]laintiff started in the new role in March 2021, he performed the duties of his new role without incident." (Id. ¶ 133). "Plaintiff did not complain regarding the role, seek to transition to his former position, or express any concerns regarding his job responsibilities." (Id. ¶ 138). "Plaintiff began developing the cyber security and incident response processes by gathering data and interviewing employees within DevOps and other Company Departments." (Id. ¶ 139).

"On May 19, 2021, Van Steenbergen emailed Plaintiff stating, among other things, 'I missed you on our Monday morning Staff meeting, without notice. Please give me a heads up when you cant[sic] join.'" (Id. ¶ 140). "Plaintiff responded the same day, stating that he had attended the meeting." (Id. ¶ 141). Van Steenbergen replied, stating "in order to promote accountability and communication within the team, that '[i]n the staff meeting I called it out explicitly if you were in as I did not see you online,' and '[l]ets make sure next time this is not a question if you were there or not, its ok if you are unable to make it, just let me know.'" (Id. ¶ 142). In further response, plaintiff stated:

Regardless, of what happened, your tone of communication towards me is inappropriate and I resent any effort on your part to demine [sic] me either as a person or employee. . . . We have a working relationship that should be based on trust and honesty. You seem to be questioning my honesty and integrity. . .

(Id. ¶ 143). After Van Steenbergen suggested an in person meeting about the topic, plaintiff noted additionally:

> Look, I like to give people the benefit of the doubt. For example, when you did not include my job change in your corporate communication, I took it as an honest mistake and nothing more. When, I noticed our 1 /1 fell off the calendar, I was the one to make you aware of it, so we could get back on track, from a communication perspective.
>
> I remember, you telling me one day, during a 1/1, that you sometimes are tough with me. And my response to you was "Really?, I have not noticed". Why? Because I gave you the benefit of the doubt and said to myself . . . . That's just how you communicate. But, I was wrong . . . you are like that only with me, especially in meetings. The bad thing about this is that the rest of the team can feel your negative energy towards me and that's not a good thing.
>
> I accept your apologies, because we are all humans and we make mistakes sometimes. We can chat more about this in our next 1/1, since talking in person is much better than email and hopefully we can put all of this behind. But, in my heart right now, I feel you don't have my best interest at heart. Maybe I am wrong about that, but that's how I feel and I am being 100% honest with you.

(Id. ¶ 146).

"At some point between when he assumed his new role in March 2021, and when he resigned his employment on June 15, 2021, [p]laintiff states that he 'realized' that his new role was 'worthless,' because he was no longer managing employees, because he was not 'driving innovation with new technologies,' because he had become an 'individual contributor,' and because he would be 'simply setting up processes,' which he believed 'an associate level individual' or 'junior level' employee could do, 'not somebody with [plaintiff's own] capability and knowledge and experience." (Id. ¶ 159). This "realization" made plaintiff "feel like he was 'less important, less valued,' and he was 'demoralized.'" (Id. ¶ 160). Plaintiff also "believed that Van Steenbergen 'pushed false narratives' regarding [p]laintiff: that [p]laintiff was on a performance improvement plan, when he was not; that [p]laintiff did not complete a goal because he was out sick; that [p]laintiff's 'organization was chaotic,' which caused employees to leave,

when in fact they 'were able to get other roles as a result of [plaintiff],' and his 'leadership, []

coaching, and [] development,' and because under [p]laintiff, they 'learned new skills' and

'became more credible.'" (Id. ¶ 161).

Plaintiff also "believed that Van Steenbergen did not 'push[] false narratives' regarding

[p]laintiff's peers, as he did with [p]laintiff, and that Van Steenbergen instead promoted

[p]laintiff's peers, but not [p]laintiff." (Id. ¶ 162). Plaintiff concluded "that this difference in

treatment was due to [p]laintiff's race, because [p]laintiff was 'the only black person on [Van

Steenbergen's] team' and despite that Van Steenbergen 'acknowledged that [plaintiff] had a high-

performing team due to [plaintiff's] leadership,' he was nevertheless treated differently than his

'white counterparts.'" (Id. ¶ 163).

"Van Steenbergen never said anything to Plaintiff regarding his race or national origin."

(Id. ¶ 165). "Plaintiff states that he believed that, generally, at some unspecified time, Van

Steenbergen was 'condescending,' 'disrespectful' or 'negative' toward [p]laintiff, and

'demeaning' toward [p]laintiff in conversation." (Id. ¶ 166). Plaintiff believed "that when he

spoke with Van Steenbergen in person, he was 'harsher, tougher in tone' than he was via email."

(Id. ¶ 167).

Plaintiff emailed Van Steenbergen on June 15, 2021, informing him that he was "resigning

from his employment" with defendant, (Id. ¶ 170), specifically from his "position as Director of

Operations Engineer effective [that date] with a two week notice." (Def's Ex. C8 (DE 50-10) at

2). The email further stated plaintiff was "grateful for all of the opportunities this [c]ompany has

given me, and I've learned so much my entire time here. Thank you again for your support,

especially during the time of my medical recovery." (Id.).

11

Plaintiff then spoke with Dionne Green ("Green"), a member of defendant's human resources department, on June 18, 2021, and "communicated that he felt he had not been treated fairly by Van Steenbergen because Van Steenbergen told [p]laintiff he believed [p]laintiff was on a performance improvement plan, which he was not; that Van Steenbergen 'said that people on my team were leaving because of the chaotic situation,' which [p]laintiff did not believe was chaotic; and that Van Steenbergen 'used the FMLA against' [p]laintiff by stating that he did not achieve an objective because he was out sick." (Id. ¶ 180).

Plaintiff also "told Green that he 'did not want to leave [defendant],' that he 'love[d] working there,' and that he 'wanted to retire there,' but he that resigned because of Van Steenbergen's treatment, and because he felt that his new role 'wasn't as valuable,' and he 'didn't feel the desire to go to work,' because he found his new role 'worthless' and 'purposeless.'" (Id. ¶ 181). "Green agreed to investigate Plaintiff's concerns." (Id. ¶ 182). "Over two weeks later, on June 29, 2021, [p]laintiff responded to Green requesting a 'status update' regarding complaints with Van Steenbergen, which he then listed:

> For year 2020, I had the highest performing Team within DevOps, as a results, many people got promoted or moved to other functional areas. However, my boss saw it a negative. For example, he said that in 2020 my team was Chaotic, because many people were leaving. He failed to understand that because of my leadership, mentoring and coaching, members of my team developed and became more marketable which explains the promotions/changes.
>
> He also used my sick leave (FMLA) against me, in my performance review, by stating that SLO and Problem Management objectives were not operationalized because I was out sick. When I went out on sick leave, I was protected by FMLA, so it concerns me that it was used as a performance issue. During a reorganization he made, my boss moved me to a different role with no direct reports. I have asked him to allow me to continue managing people (For example the Security Team) which is a concern of mine, being that this will be first time in my professional career, I don't have direct reports. He has not taken me seriously.
>
> Communication - He purposely did not include my new role in his corporate communication. He also talks to me in a condescending and disrespectful manner.

I confronted him about it and he was very defensive, and he eventually apologized about it.

Last, I was forced to resign, because [Van Steenbergen] was biased against me in a discriminatory way by treating me different [sic] than my peers. I concluded that he discriminated against me because of my race.

(Id. ¶ 185). On June 30, 2021, Green responded, stating:

Thanks for providing the below email; however, you did not tell me about a forced resignation during our phone conversation. You advised you took another Director role. I would have documented that in the email dated 6/18/2021 that recapped our discussion and the actions you would like to occur.

(Id. ¶ 186). Defendant "reviewed [p]laintiff's complaints and determined the allegations to be unfounded." (Id. ¶ 189).

## COURT'S DISCUSSION

A.     Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

13

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

B.      Analysis

Defendant argues that summary judgment is required in its favor because plaintiff has not demonstrated a genuine issue of fact regarding pretext or a hostile work environment. The court agrees. Where summary judgment is warranted on these grounds, the court does not reach additional grounds for summary judgment raised by defendant.[5]

---

[5]      In particular, the court does not reach the issue of whether plaintiff has met the elements of a prima facie case of discrimination under Title VII. See, e.g., Adkins v. CSX Transportation, Inc., 70 F.4th 785, 793 (4th Cir. 2023)

14

When an "employer offers a legitimate, nonretaliatory or nondiscriminatory reason for [an] adverse action, the plaintiff bears the burden of establishing that the employer's proffered explanation is pretext for retaliation or discrimination." Adkins v. CSX Transportation, Inc., 70 F.4th 785, 793 (4th Cir. 2023).[6] To demonstrate a genuine issue of fact of pretext, an employee must bring forth evidence demonstrating the employer's "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of . . . discrimination." Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004).

For example, an employee may "present evidence reasonably calling into question the honesty of [her] employer's belief" in the reasons for the adverse action. DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998). Or, a plaintiff may show that an employer's justification "could be discredited . . . as inconsistent and contradictory." Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 575 (4th Cir. 2015). Likewise, "a plaintiff may show that an employer's proffered nondiscriminatory reasons for the [adverse action] are . . . false, or based on mistakes of fact." Sempowich v. Tactile Sys. Tech., Inc., 19 F.4th 643, 652 (4th Cir. 2021).

As additional circumstances bearing on pretext, a plaintiff also may rely upon "comparator evidence." Laing, 703 F.3d at 721. However, "[t]he similarity between comparators . . . must be clearly established in order to be meaningful." Lightner v. City of Wilmington, N.C., 545 F.3d 260, 265 (4th Cir. 2008). "[R]elevant considerations include whether the plaintiff and comparator dealt with the same supervisor, were subject to the same standards[,] and engaged in the same

---

(proceeding to the question of pretext, while "assum[ing] without deciding, . . . that the plaintiff[] carried [her] initial burden of establishing a prima facie case under the pertinent statutes," governing employment discrimination on the basis of race, sex, and retaliation); see also Muldrow v. City of St. Louis, Missouri, No. 22-193, 2024 WL 1642826, at *5 (U.S. Apr. 17, 2024) ("lower[ing] the bar Title VII plaintiffs must meet" to show an adverse employment action based on an alteration of job responsibilities).

[6]     Internal citations and quotation marks are omitted from all case citations in this order unless otherwise specified.

conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  Cowgill v. First Data Techs., Inc., 41 F.4th 370, 381 (4th Cir. 2022).  "The plaintiff must provide evidence that the proposed comparators are not just similar in some respects, but similarly-situated in all respects."  Id. at 381-382.

With these principles in mind, the court turns first to identifying plaintiff's asserted adverse employment action and defendant's asserted legitimate, non-discriminatory reason(s) for the action.  Then, the court considers plaintiff's asserted grounds for pretext and discrimination.

1.      Adverse Employment Action

Title VII prohibits "discriminat[ing] against" an individual, as pertinent here, "with respect to" the "terms [or] conditions" of employment because of that individual's race.  42 U.S.C. § 2000e-2(a)(1).  As such, an adverse employment action may include "a change in [a plaintiff's] job responsibilities," or a transfer to a new position, that brings "about some disadvantageous change in an employment term or condition."  Muldrow v. City of St. Louis, Missouri, 601 U.S. ___, No. 22-193, 2024 WL 1642826, at *4 (Apr. 17, 2024).

Here, plaintiff suggests that his reassignment to a new role on or about March 1, 2021, at Van Steenbergen's request (hereinafter, the "reassignment"), was an adverse employment action because it resulted in different duties and responsibilities and the removal of "the team that worked under him."  (Compl. ¶ 20; see Pl's Mem. (DE 55) at 6-7).  Defendant argues this does not constitute an adverse employment action because it did not have a "significant detrimental effect" on plaintiff's employment, citing James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 376 (4th Cir. 2004).  James and the standard articulated, however, recently expressly was abrogated by the United States Supreme Court in Muldrow.  See 601 U.S. at ___, 2024 WL 1642826, at *4 n. 1 (noting the Fourth Circuit "rewrote Title VII, compelling workers to make a showing that the

statutory text does not require"). Accordingly, for purposes of the instant analysis, the court "assumes without deciding," Adkins, 70 F.4th at 793, that plaintiff's reassignment constituted an adverse employment action, and the court turns next to examining defendant's reasons given for the reassignment.

        2.        Legitimate Non-Discriminatory Reasons

An employer seeking summary judgment bears the burden "to articulate a legitimate, nondiscriminatory reason for the adverse employment action." Holland v. Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007). "This burden, however, is a burden of production, not persuasion," which may be met for example "by producing affidavits and testimony demonstrating" the employer's reasons for the asserted adverse employment action. Id.

Here, defendant's reasons for the reassignment are set forth in the declaration of Van Steenbergen and in the undisputed facts. In particular, Van Steenbergen states "[i]n early 2021, I was directed by Day and other high-ranking employees of N-able to make certain organizational changes in preparation for the July 2021 Spin-Off, as well as instructions related to certain tasks the DevOps Department needed to accomplish in preparation for the Spin-Off." (Van Steenbergen Decl. (DE 50-1) ¶ 51). He further states, "I was tasked with assigning a member of my team to develop and manage these cybersecurity and incident response processes in preparation for the Spin-Off." (Id. ¶ 55). "This was a high-impact and high-visibility position with significant opportunity for professional growth, leadership, and advancement within the Company. The position was crucial to N-able's success." (Id. ¶ 56).[7]

---

[7]     Plaintiff disputes several statements in defendant's statement of facts on the grounds that "[t]he material cited to support or dispute this fact cannot be presented in a form that would be admissible in evidence." (E.g. Pl's Stmt. (DE 56) ¶¶ 66-68). However, Rule 56(c)(1) allows a party asserting that a fact cannot be disputed may support the assertion by citing to, inter alia, "declarations," Fed. R. Civ. P. 56(c)(1), which, in turn, must be made "on personal knowledge." Fed. R. Civ. P. 56(c)(4). Here, Van Steenbergen states that he has "personal knowledge of the facts set forth in [his] Declaration." (Van Steenbergen Decl. ¶ 2).

With respect to selection of plaintiff, Van Steenbergen states that "[i]n determining which member of my team within the DevOps Department was best suited for this role, I heavily considered the employees' experience in this area." (Id. ¶ 57).[8] He states he "was aware that [plaintiff] had been teaching classes at a university regarding incident response, and that he was quite knowledgeable and experienced regarding cybersecurity and incident response processes." (Id. ¶ 58). He further states he "was also aware from my work with [plaintiff] of his technical and leadership experience, and I believed he had the ability to develop a plan for this new function, and to grow the position." (Id. ¶ 59). He "believed that a Director-level employee would be best suited to undertake the role, as a Director would have the leadership and strategic ability to develop a plan for this new function, and to grow the position and eventual team." (Id. ¶ 60). Accordingly, per Van Steenbergen, "[i]n light of [plaintiff's] technical and leadership experience, and experience in cybersecurity and incident response processes, [he] decided to offer [plaintiff] the opportunity to adjust his job functions to focus on developing the cyber security and incident response processes." (Id. ¶ 61).

Additional facts concerning the reasons for the reassignment are undisputed. In particular, "[o]n January 18, 2021, Van Steenbergen met with Plaintiff to discuss the possibility of his assuming the cybersecurity and incident response processes role, and to offer Plaintiff the position." (Def's Stmt. (DE 49) ¶ 73). Van Steenbergen "recalls explaining that while [p]laintiff would not have direct reports, at least for some initial period, [p]laintiff would remain a Director

---

[8]    Plaintiff disputes the veracity regarding this assertion, and others, in Van Steenbergen's declaration. (See, e.g., Pl's Stmt. (DE 56) ¶ 70). The court addresses further below in the analysis of pretext whether plaintiff has demonstrated a genuine issue of material fact as to the truthfulness of the assertions by Van Steenbergen in his declaration. For purposes of the instant analysis, the court addresses only the basis upon which defendant has met its "burden of production" to articulate a legitimate, nondiscriminatory reason for the asserted adverse employment action. Holland, 487 F.3d at 214.

within the DevOps Department, would continue to report to Van Steenbergen, and that his pay, bonus opportunity, and benefits would remain unchanged." (Id. ¶ 77). "Van Steenbergen encouraged [p]laintiff, should he accept the role, to identify specific areas where he needed direct reports or felt that direct reports could contribute, as was required for all personnel budget requests." (Id. ¶ 82). Van Steenbergen reiterated he would like plaintiff "to focus on incident and problem management, where you and your experience should make this a solid process into our org and outside." (Def's Ex. C2 (DE 50-4) at 3).

In sum, the legitimate non-discriminatory reasons for plaintiff's reassignment were that defendant needed to create a new position for its business processes, Van Steenbergen offered the new position to plaintiff due to his qualifications and experience, and plaintiff accepted the reassignment.

3.      Pretext

Plaintiff contends the reasons given by defendant for his reassignment are pretext for discrimination, based on several categories of evidence. The court addresses each in turn below.

a.      Knowledge of Plaintiff's Qualifications

Plaintiff argues that Van Steenbergen's stated reasons for selecting plaintiff for reassignment were false because Van Steenbergen did not have "any knowledge of [p]laintiff's qualifications, education, leadership, and excellent performance" at the time of his decision to reassign plaintiff. (Pl's Mem. (DE 55) at 6). This assertion in plaintiff's brief, however, that Van Steenbergen did not have "any knowledge" of these characteristics of plaintiff, is belied by undisputed evidence in the record.

In fact, Van Steenbergen states in his declaration that he was one of the individuals who interviewed plaintiff for his initial position in December 2018. (Van Steenbergen Decl. (DE 50-

1) ¶ 26).  He states was aware then of plaintiff's "experience and interview, during which [plaintiff] demonstrated that he was well-versed in DevOps and the duties of the role."  (Id. ¶ 28).[9]  Then, "[f]rom December 3, 2018 to November 2020, though [he] did not have the occasion to work with [plaintiff] often, when [they] did work together, [Van Steenbergen] found [plaintiff] to be professional and competent in performing his duties."  (Id. ¶ 34).[10]  He "did not hear or understand that [plaintiff] had any performance issues."  (Id.).  In addition, he knew they were "fellow Directors of the Company within the same reporting structure."  (Id. ¶ 33).  During plaintiff's leave of absence from July 2020 to September 2020, plaintiff's direct reports "were managed by Day, [Van Steenbergen], and others within the Department."  (Id. ¶ 40).

Then, when Van Steenbergen became plaintiff's supervisor in November 2020, he held a meeting with plaintiff "to discuss [plaintiff's] prior experience and role within the DevOps Department, as well as [his] goals and expectations for the position."  (Id. ¶ 43).[11]  Following that initial meeting, he "held weekly one-on-one meetings with [plaintiff] to support his job responsibilities, concerns, and goals, as was my practice with all my direct reports."  (Id. ¶ 50).  He also "was aware that [plaintiff] had been teaching classes at a university regarding incident response, and that he was quite knowledgeable and experienced regarding cybersecurity and incident response processes."  (Id. ¶ 58).  Further, he was "aware from [his] work with [plaintiff] of his technical and leadership experience," including that he had been "a Director-level employee."  (Id. ¶¶ 59-60).  Thus, plaintiff's argument is contrary to the record.

---

[9]    Paragraph 22 of defendant's statement of facts, which is undisputed, states: "Based on Plaintiff's experience and interview, Van Steenbergen recommended that Day select Plaintiff for the position."  (Def's Stmt. (DE 49) ¶ 22; see Pl's Stmt. (DE 56) ¶ 22).

[10]    (See also Def's Stmt. (DE 49) ¶ 52; Pl's Stmt. (DE 56) ¶ 52).

[11]    (See also Def's Stmt. (DE 49) ¶¶ 47-56; Pl's Stmt. (DE 56) ¶¶ 47-56).

Evidence cited by plaintiff also does not support the proposition that Van Steenbergen did not have "any knowledge of [p]laintiff's qualifications, education, leadership, and excellent performance" in January 2021. (Pl's Mem. (DE 55) at 6). For example, plaintiff cites paragraph 30 of Van Steenbergen's declaration, wherein he states "[d]uring Gelin's employment, [he] was not aware of [plaintiff's] Haitian national origin, nor that Gelin was born and raised in Haiti." (See Id.). But, this proposition has nothing to do with plaintiff's qualifications, education, leadership, or excellent performance, and Van Steenbergen confirms this did not have "any impact on [his] decisionmaking." (Van Steenbergen Decl. (DE 50-1) ¶ 30). Plaintiff also cites the undisputed facts that Van Steenbergen became plaintiff's supervisor only a few months before January 2021, and they did not work closely together previously, (e.g., Pl's Stmt. (DE 56) ¶¶ 70-72), but these facts do not undermine any of Van Steenbergen's own statements about the basis for his beliefs in plaintiff's qualifications. (Van Steenbergen Decl. (DE 50-1) ¶¶ 26-60).

Accordingly, plaintiff's first argument in support of pretext is without merit.

      b.      Discrepancies between Declaration and Deposition

Plaintiff asserts there are discrepancies between Van Steenbergen's declaration and deposition testimony regarding his knowledge of plaintiff's qualifications that demonstrate pretext. For instance, plaintiff cites pages "20:25-30:5" of Van Steenbergen's deposition. (Pl's Mem. (DE 55) at 6). However, the first eight cited pages concern Van Steenbergen's own training, and thus are not pertinent to the question of defendant's reasons for the reassignment.[12] Regarding plaintiff's qualifications, at page 29, Van Steenbergen testifies he first met plaintiff during his

---

[12] Similarly impertinent to pretext are purported differences between Van Steenbergen's deposition testimony and statements in his deposition cited by plaintiff that have nothing to do with Van Steenbergen's reasons for reassigning plaintiff. (See Pl's Mem. (DE 55) at 5; Van Steenbergen Dep. (DE 56-1) at 10, 14, 16, 21, 29-30, 43, 83, 96).

interview, but he could not then recall the date, and he referred instead to this declaration for the date. (Van Steenbergen Dep. (DE 56-1) at 29:20).[13] The mere fact that Van Steenbergen referred to his declaration for the date of the interview, however, is not sufficient to demonstrate that his statements about that interview were false or inconsistent. Further, Van Steenbergen testified that he recalled that he "gave [his] thumbs up to . . . hire [plaintiff] . . . as [he] seen him fit for the - - for the role," (Id. at 29:25-30:1), which is consistent with the statement in his declaration that after the interview he "recommended that Day select Gelin for the position." (Van Steenbergen Decl. (DE 50-1) ¶ 28). Thus the cited discrepancies do not show that defendant's justification for the reassignment was "inconsistent or contradictory." Jacobs, 780 F.3d at 575.

Plaintiff next cites to pages "30:25-31:2" of Van Steenbergen's deposition in which he is asked what he based his "thumbs up" opinion on. (Van Steenbergen Dep. (DE 56-1) at 30:25). Van Steenbergen responded he based it on "the discussion and the talk . . . we had," but he could not "recall if [they] spoke about his previous roles at that point." (Id. at 31:1-31:8). Plaintiff thus suggests a discrepancy with Van Steenbergen's declaration, in which he states he based his hiring recommendation on plaintiff's "experience and interview." (Van Steenbergen Decl. (DE 50-1) ¶ 26) (emphasis added). However, this discrepancy about what was known in 2018 does not create a genuine issue of fact as to the justification for the reassignment, three years later, in 2021, because of the substantial additional knowledge gained by Van Steenbergen in the intervening time period. As such, this is a "minor discrepanc[y] that do[es] not cast doubt on" the validity of the justification for the reassignment in 2021. Hux v. City of Newport News, Va., 451 F.3d 311, 315 (4th Cir. 2006).

---

[13]     Throughout this order, page numbers in citations to deposition transcripts, as here, are to the page number showing on the face of the deposition transcript, and not to the page number, if any, specified in the document footer by the court's case management / electronic case filing ("CM/ECF") system. Page numbers in all other citations to documents in the record are to the CM/ECF page number.

Likewise, plaintiff cites to "84:7-10" of Van Steenbergen's deposition, which lines are underlined here within the following deposition excerpt:

Q. What were [DeLeon's] specific skills that made him a good candidate for promotion?

A. So he was really good in making the projects manageable by the teams, creating the scopes so that the teams exactly know what -- what to expect and could plan it correctly. His reporting skills were excellent.

Q. Anything else?

A. I can't recall. Like the -- the -- like I think this is the most important thing for a project manager.

Q. Okay. Did -- did [plaintiff] have those skills?

A. It -- I don't know because it was not for his responsibilities. Like, the directors don't manage projects.

Q. Did -- did [plaintiff] have any --

A. It's a different role.

Q. Did [plaintiff] have any -- did he lack any skills that you recall? . . . .

A. No, no. Sorry, no.

(Van Steenbergen Dep. (DE 56-1) at 83:21-84:16) (emphasis added). This testimony does not create a genuine issue of material fact of pretext. As an initial matter it is not plausible to infer from the testimony that Van Steenbergen doubted plaintiff's qualifications for the reassignment. It also does "reasonably call[] into question the honesty of [plaintiff's] employer's belief" in the reasons for the reassignment, DeJarnette, 133 F.3d at 299, nor that those reasons "could be discredited . . . as inconsistent and contradictory," or false. Jacobs, 780 F.3d at 575; Sempowich, 19 F.4th at 652. Rather, the differences, if any, between Van Steenbergen's knowledge of DeLeon's skills and plaintiff's skills "do not cast doubt on the explanation's validity," or "are wholly irrelevant to it." Hux, 451 F.3d at 315.

In sum discrepancies cited by plaintiff are insufficient to create a genuine issue of fact of pretext.

        c.      Promotion Opportunities

Plaintiff suggests that defendant should have more accurately recognized the value of his skills and promoted him to a "first-tier management position" at the time of the reorganization, rather than giving him a reassignment that he considered to be a demotion. (Pl's Mem. (DE 55) at 4). This suggestion fails on two levels.

First, plaintiff does not identify any available position to which he should have been promoted. There is no evidence in the record of plaintiff requesting or applying for a promotion position and having that request denied. Second, plaintiff's suggestion amounts to no more than "second-guess[ing] the soundness . . . [of] managerial decisions," or other business decisions, of the defendant employer. Mereish, 359 F.3d at 339. "[T]his Court does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." DeJarnette, 133 F.3d at 299. "It is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason" for the adverse employment action. Id.

Accordingly, plaintiff's argument based upon a suggestion of a failure to promote is without merit.

        d.      Comparators

Plaintiff contends he is intitled to relief because "non-black, non-Haitian, similarly situated employees were promoted (including his own, former-direct reports), and his replacement ([Glenn] Hollingsworth) was provided several direct reports." (Pl's Mem. (DE 55) at 5). This contention fails on multiple levels.

As an initial matter, regarding other employees who were promoted, plaintiff does not provide any evidence that any of them were "similarly-situated in all respects" to plaintiff. Cowgill, 41 F.4th at 382. He does not show that they "dealt with the same supervisor, were subject to the same standards[,] and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Id. at 381. For example, plaintiff cites no evidence that any of the promoted employees was a director, or was asked to take on a newly-created position, or did in fact commence work in a new position. The undisputed evidence concerning other promotions (e.g., Def's Stmt. (DE 49) ¶ 113), does not suggest "[t]he similarity between comparators . . . [is] clearly established." Lightner, 545 F.3d at 265. Plaintiff accordingly has not demonstrated pretext or discrimination through comparison to other promoted employees.

Plaintiff similarly has not met his burden regarding his argument concerning his "replacement (Hollingsworth)." (Pl's Mem. (DE 55) at 5). As an initial matter, plaintiff does not cite to evidence to enable the court to draw a meaningful comparison between Hollingsworth and plaintiff. He cites to the deposition testimony of Skahan, taken December 5, 2023, where she notes that Hollingsworth started in the summer of 2021, and he "came in to fill that position after [plaintiff] vacated the role" from another company. (Skahan Dep. (DE 56-3) at 21:15-16). Skahan testified that she believed Hollingsworth has five direct reports. (Id. at 21:25). This evidence, however, is not sufficient to create a genuine issue of fact as to pretext based upon comparison to Hollingsworth. For example, it does not show how many direct reports Hollingsworth had when he commenced the position in 2021, or if he obtained direct reports by demonstrating their need, which was an undisputed requirement of the position previously held by plaintiff. (See Def's Stmt. (DE 49) ¶ 82).

In sum, plaintiff has not demonstrated a genuine issue of fact regarding pretext or "other forms of circumstantial evidence sufficiently probative of . . . discrimination." Mereish, 359 F.3d at 336. Therefore, his claim for discrimination based upon race and national origin fails as a matter of law.

2.     Hostile Work Environment

"A hostile environment that violates Title VII exists when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Holloway v. Maryland, 32 F.4th 293, 300 (4th Cir. 2022). To establish a hostile work environment claim, a plaintiff must demonstrate: "(1) he experienced unwelcome harassment; (2) the harassment was based on his race or protected activity; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." Id. "While the first element is subjective, the rest of the test is made up of objective components based on a reasonable person standard." Robinson v. Priority Auto. Huntersville, Inc., 70 F.4th 776, 781–82 (4th Cir. 2023).

Here, plaintiff's hostile work environment claim fails because he has not introduced any evidence giving rise to a reasonable inference of harassment "based on his race or protected activity." Holloway, 32 F.4th at 300. Plaintiff suggests that he has demonstrated harassment based upon race because he was treated differently from "supervisors and peers" who were white. (Pl's Mem. (DE 55) at 8). It is true that a court "may infer that harassment is based on race when the plaintiff suffered harassment more often than others of different races or suffered harassment of a kind likely to be motivated by race." McIver v. Bridgestone Americas, Inc., 42 F.4th 398, 409 (4th Cir. 2022). "But a plaintiff cannot rely on [his] own conjecture to impute a racial character to

26

what appears to be neutral harassment." Id. Here, there are no alleged racially derogatory comments or references to race by the alleged harasser, Van Steenbergen. See, e.g., Laurent-Workman v. Wormuth, 54 F.4th 201, 212 (4th Cir. 2022) (noting that "the sort of workplace behaviors that Title VII serves to root out [are] repeated invectives of an overtly racial tenor"). In addition, plaintiff does not cite to evidence of instances he was harassed "more often than others of different races or suffered harassment of a kind likely to be motivated by race." McIver, 42 F.4th at 409. "[I]n the absence of plausible allegations that, for example, [a comparator was] similarly situated, such an [assertion] indicates only that [he] was treated differently, not that [he] was treated differently because of [his] race." Lemon v. Myers Bigel, P.A., 985 F.3d 392, 399–400 (4th Cir. 2021).

In addition, plaintiff has not demonstrated "harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere." Holloway, 32 F.4th at 300. A plaintiff "must clear a high bar in order to satisfy the objective severe or pervasive test." Perkins v. Int'l Paper Co., 936 F.3d 196, 208 (4th Cir. 2019). "Objective analysis of whether a workplace is hostile and abusive looks to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." McIver, 42 F.4th at 407. None of these factors are present here: the record lacks evidence of the type of frequent invectives, threatening or humiliating comments, or other markers of a severe and pervasive work atmosphere. Cf. E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 316 (4th Cir. 2008). (finding the severe or pervasive element satisfied where plaintiff "was subject to repeated comments that disparaged both him and his faith"); Id. at 311 ("[T]he abusive environment was marked by a steady stream of demeaning comments and degrading actions

directed against him by his coworkers."); Ocheltree, 335 F.3d at 328-29 ("[Plaintiff's] male coworkers subjected her to a daily stream of discussion and conduct that was sex based or sexist.").

Plaintiff asserts that he was subject to a hostile work environment because his "job duties changed entirely; [] his entire support system (of direct reports) were pulled out from under him to support his white superiors; and he was assigned an exponentially larger task that required more hands-on deck like that which was given to his white replacement (Hollingsworth)." (Pl's Mem. (DE 55) at 7-8). He claims he was "segregated from his peers, and stripped of all authority to direct a member of Defendant's DevOps department," conduct which was "ignored by Van Steenbergen." (Id. at 8). He also suggests Van Steenbergen questioned his honesty and integrity without basis, and that he used an "inappropriate tone" with him. (Defs' Stmt. (DE 49) ¶¶ 143, 146, 185).

However, none of these asserted hardships meet the requisite standard. "Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard. Some rolling with the punches is a fact of workplace life." Sunbelt Rentals, Inc., 521 F.3d at 315. Harsh workplace demands, unfair criticism, and unpleasant evaluations by supervisors, along the lines described here, are not sufficient to meet the test. See, e.g., Holloway, 32 F.4th at 301 (holding severe and pervasive test not met where "over the course of several months" supervisor required employer to communicate with peer instead of supervisor; "employees were surveyed about [plaintiff's] leadership and his whereabouts during the workday"; another supervisor "criticized [plaintiff's] leadership and budget management in meetings"; that supervisor "scheduled a meeting an hour and a half before [the plaintiff's] usual start time" and "did not honor [him] in an employee-recognition program").

In sum, plaintiff has failed to establish a genuine issue of material fact on all the elements of a hostile work environment claim.

C.      Motion to Withdraw

One of plaintiff's attorneys, Faith R. Fox ("Fox"), based in Charlotte, North Carolina, moves to withdraw, noting that she has "stepped down as" managing partner in her firm, and that this leaves "Lead Counsel Michael Mann," ("Mann"), as plaintiff's sole counsel.  (Pl's M. to Withdraw (DE 62) at 1).  According to the docket and the motion, Mann is based in Florida, and has "opened his own law office," and he "is aware he will need to secure alternate pro hac vice attorney."  (Id.).  Plaintiff has no objection to this change.  For good cause shown, the motion to withdraw is allowed.

Local Civil Rule 83.1(d) requires all persons appearing in civil actions in this court to be "represented by at least one member of the bar of this court who shall sign all documents filed in this court," and it prohibits special appearance attorneys who are not members of the bar of this court from making filings without submitting "any document to Local Civil Rule 83.1(d) counsel for review prior to filing the document with this court."  Local Civil Rule 83.1(e)(1)(d.).  "Any document filed by a special appearance attorney that does not comport with associated Local Civil Rule 83.1(d) attorney's standards may be objected to."  Local Civil Rule 83.1(e)(4).

Ordinarily, the court would require as a condition of withdrawal of local counsel that special appearance counsel, here Mann, cause local counsel to enter an appearance within a set amount of time following the withdrawal.  In this instance, where the court determines that summary judgment is warranted in favor of defendant, and the case is hereby closed as a result following entry of this order (notice of which is provided to Fox for purposes of notice also to plaintiff, under Local Civil Rule 83.1(e)(2)), the court does not herein require appearance of local

counsel. However, in the event plaintiff seeks to make any future filings in this case, plaintiff's special appearance counsel, Mann, must cause local counsel to enter an appearance prior to making such filing.

## CONCLUSION

Based on the foregoing, defendant's motion for summary judgment (DE 48) is GRANTED. Plaintiff's motion to withdraw as attorney (DE 62) is GRANTED on the terms set forth herein. The clerk is DIRECTED to close this case.

SO ORDERED, this the 23rd day of April, 2024.

LOUISE W. FLANAGAN
United States District Judge